IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 1, 2017

## JOHN MOFFITT v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Henderson County**
No. 16067-1    Roy B. Morgan, Jr., Judge

_____

No. W2016-02487-CCA-R3-PC

_____

A jury convicted the Petitioner, John Moffitt, of reckless aggravated assault, and the trial court sentenced him to four years of incarceration. The Petitioner appealed, and this court affirmed his conviction and sentence. *State v. John Moffitt*, No. W2014-02388-CCA-R3-CD, 2016 WL 369379, at *1 (Tenn. Crim. App., at Jackson, Jan. 29, 2016), *perm. app. denied* (Tenn. June 24, 2016). The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court denied the petition. On appeal, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ. joined.

Michael Thorne, Lexington, Tennessee, for the appellant, John Moffitt.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from the Petitioner's using a pocketknife to cut and injure the victim. On direct appeal, we summarized the facts presented at the Petitioner's trial as follows:

On May 16, 2013, Stephen Phelps, the victim in this case, was doing repair work for landowner Charles McPeake on a fence and outbuilding that had been damaged in a storm. At approximately 4:00 p.m., Mr. Phelps began loading his tools into his truck. Mr. Phelps "heard two people kind of being loud with each other[.]" He turned around and saw [the Petitioner] and Orbin McPeake arguing about the fence. Mr. Phelps approached the men and told [the Petitioner] to "[c]hill out" because they were going to repair the fence. [The Petitioner] told Mr. Phelps to put the fence back up, and Mr. Phelps told [the Petitioner] to "[j]ust go on home." [The Petitioner] turned around to leave and then turned back towards Mr. Phelps. Mr. Phelps testified, "as he was doing that, I saw him reach into his pocket and he pulled out a pocket knife and he opened it up, and he says, 'well maybe you want some of this before I leave[.]'" [The Petitioner] swung the knife across Mr. Phelps body and back across his body a second time. Mr. Phelps raised his arm to block it, and on the second swing across his body, "it sunk in [his] arm [.]" [The Petitioner] "just turned and walked away[.]" Mr. Phelps "could not believe that it happened." He wrapped up his arm and drove to the hospital. Mr. Phelps testified that he could not use his arm for approximately four months. He testified that he still had numbness in one of his fingers and pain in his shoulder. He was unable to perform certain tasks as well as he could prior to the injury.

On cross-examination, Mr. Phelps testified that he had only seen [the Petitioner] once before the incident. He testified that the fence had been taken down for approximately one month prior to the incident while he worked to repair the barn. Mr. Phelps testified that he took one or two steps towards [the Petitioner] after [the Petitioner] pulled out the knife.

Orbin McPeake testified that he had known [the Petitioner] for "[a] long time." He testified that on the day of the incident, [the Petitioner] "just came out there and jumped on us and told us we needed to get that fence put up by 4:00 or something like that[.]" Mr. McPeake told [the Petitioner] that they were working to "get everything cleaned up." Mr. McPeake testified that he saw [the Petitioner] and Mr. Phelps "in each other's face[s], and Mr. Phelps told [the Petitioner] he needed to go home[.]" Mr. McPeake saw [the Petitioner] reach into his pocket, and he saw [the Petitioner] and Mr. Phelps "arguing right close together and [Mr. McPeake] was trying to get them to go home and be quiet and let everything go, and they just kept arguing." Mr. McPeake testified that he "d[id]n't think [Mr. Phelps] was really threatening [the Petitioner]. He was just talking and telling him that we was gonna fix that back and that wasn't

2

none of his business."  Mr. McPeake heard Mr. Phelps tell [the Petitioner] to go home.  Mr. McPeake testified [the Petitioner] and Mr. Phelps "met together."  He testified, "I don't know where they one of them run any more at the other one than one did it at the other one [sic]."

William Patterson was also present during the incident.  He testified that "Mr. Phelps went to walking over there towards [the Petitioner], and that's when he run his hand in his pocket and came out and cut him."  Mr. Patterson testified that he did not hear Mr. Phelps make any threats against [the Petitioner].

Donna Heatherington, a criminal investigator with the Lexington Police Department, spoke to Mr. Phelps at the hospital and took photographs of his injury.  She also took statements from Mr. Patterson and Mr. McPeake.  Officer Heatherington arrested [the Petitioner] at his residence.  She testified that she knocked on [the Petitioner]'s door, and [the Petitioner] "hollered, 'Come on in.  I know why you're here.'"  She asked [the Petitioner] to empty his pockets, and [the Petitioner] had a pocketknife in his right pocket.  Officer Heatherington testified that [the Petitioner]'s hand was injured when she put handcuffs on him.

[The Petitioner]'s brother, Sam Moffitt, testified that Mr. McPeake told him after the incident that [the Petitioner] turned around to leave, and Mr. Phelps jumped on him, and that's what caused the altercation.  Mr. Moffitt testified that Mr. McPeake told him, "If [Mr. Phelps] had just sat still and let [the Petitioner] go on, none of this would have happened."  On cross-examination, Mr. Moffit clarified what he meant by "jumped on."  He testified, "Well, I don't mean physically jumped on him, but he said, 'I'm going to do something to you,' and made some threatening statement and took off after him.'"

[The Petitioner] testified that he rented property adjacent to the property where work was being done to repair a tractor shed damaged by a storm.  On the day of the incident, [the Petitioner] approached Orbin McPeake and asked why the fence had been torn down.  [The Petitioner] testified that Mr. McPeake began cussing and told [the Petitioner] that he "told them to tear it down."  [The Petitioner] testified that he turned around and began walking away, "and the next thing I knew, somebody was behind me[.]"  He testified, "[Mr. Phelps] was in my face like that with his arm, and he swung at me with something in his hand."  [The Petitioner] testified that Mr. Phelps hit the back of [the Petitioner]'s hand with a tripod tool.

3

[The Petitioner] pulled out his pocketknife and cut Mr. Phelps' arm.

*Moffitt*, 2016 WL 369379, at *1-2. Based upon this evidence, the jury convicted the Petitioner of reckless aggravated assault, and the trial court sentenced him to four years of incarceration.

## B. Post-Conviction Facts

The Petitioner filed a petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel. The post-conviction court held a hearing during which the parties presented the following evidence: The Petitioner testified that, after he was sentenced, he realized that his attorney did not properly represent him. He recounted that he originally faced charges of aggravated assault and that he was convicted of the lesser included offense of reckless aggravated assault. The Petitioner opined that Counsel "started out doing a good job" by filing a motion regarding a violation of the Petitioner's *Miranda* rights. After argument, the trial court ruled in the Petitioner's favor on that motion. The Petitioner complained, however, that Counsel did not file any other motions, despite that some of the testimony presented by the witnesses was contradictory to their previous statements.

The Petitioner testified that, pursuant to the trial court's ruling on his motion to suppress, the State was prohibited from using anything that the Petitioner said at the time of his arrest. The Petitioner thought it was ineffective of Counsel to not object at trial when Detective Donna Heatherington began to testify about what the Petitioner had said to her when she responded to this call.

The Petitioner further complained that Counsel did not adequately impeach at least one of the witnesses. He said that Counsel also failed to obtain exculpatory evidence. He said that Counsel did not investigate whether the police recovered a tripod that the Petitioner claimed the victim had used to hit him and could have contained DNA evidence. The Petitioner complained that Detective Heatherington testified that the handcuffs cut the Petitioner's hand, rather than the tripod, but Counsel never sought to obtain the handcuffs to see if they had blood on them. He said that Counsel also never sought to obtain a video recording from the camera in the police vehicle, which the Petitioner thought would have shown whether the police handcuffed him.

The Petitioner said that he obtained a sworn statement from Tim McPeake which indicated that the victim was wrongfully fixing the fence. The Petitioner said that this statement was excluded because Counsel did not call Mr. McPeake as a witness. The Petitioner clarified that Counsel attempted to call Mr. McPeake as a witness but that the State objected on relevance grounds. The Petitioner argued the relevancy of Mr.

4

McPeake's testimony, saying that the victim had no right to tear down the fence, which he noted was still down. He said that the victim falsely told the police that he intended to rebuild the fence, which he said was proven by the fact that the victim never rebuilt the fence.

The Petitioner contended that Counsel did not present sufficient evidence regarding his mitigating circumstances as they applied to his sentencing. He said that Counsel should have argued that the Petitioner had no criminal intent at the time of this assault. He further noted that, at the time he was convicted, he was sixty-five years old and suffered from multiple health issues. Counsel neither called the Petitioner to testify about his health issues at the sentencing hearing nor called him to testify at all. The Petitioner then described some of his health-related issues. The Petitioner opined that, had Counsel called the Petitioner to testify at the sentencing hearing, there was "a good possibility that" he would have been sentenced to a probationary sentence.

The Petitioner contended that, after he was convicted, Counsel filed a motion for new trial, and the State responded. The Petitioner said that he was incarcerated at the time and that Counsel, unbeknownst to the Petitioner, waived oral argument for a motion for new trial on his behalf.

The Petitioner claimed that Counsel was ineffective with regard to jury instructions. First, the Petitioner contended that Counsel did not request an adequate jury instruction on self-defense. He asserted that the jury instruction given included self-defense only as it related to a dwelling and omitted the portion of the instruction that related to the curtilage. Next, the Petitioner contended that Counsel did not argue to the trial court that the Petitioner should only have to show that he was in fear of "bodily injury" rather than "imminent danger of death or serious bodily injury" to prove his self-defense claim. Finally, the Petitioner stated that he was unaware of any specific instructions that Counsel requested.

The Petitioner testified Counsel was ineffective for not arguing that his pocketknife was not a deadly weapon. The Petitioner said that Counsel should have filed a motion to exclude the pocketknife as a deadly weapon. The Petitioner agreed that the pocketknife was not introduced at trial.

The Petitioner contended that his indictment wrongfully omitted the "essential element of reckless." He said Counsel should have contested the indictment. He said that when he pointed this out to Counsel, Counsel responded by telling him that Counsel would take care of everything if the Petitioner would "[j]ust bring [him] the money." The Petitioner said that Counsel never discussed with him lesser-included offenses.

5

The Petitioner said that his desire was to go to trial, regardless of Counsel's advice. He said that his intent was always to go to trial.

Counsel testified that the Petitioner hired him after discovery had been requested. The Petitioner expressed his dissatisfaction with the attorney who represented him at the arraignment. The Petitioner informed Counsel that this attorney had also represented the Petitioner previously when he was convicted of murder but that the conviction had been overturned based on that attorney's ineffective assistance of counsel.

Counsel said that he was familiar with the Petitioner's brother, who arranged for him to meet with the Petitioner. He said that, after the Petitioner retained him, Counsel obtained a record from the preliminary hearing. After listening to the preliminary hearing, Counsel successfully filed a motion to suppress certain statements by Detective Heatherington.

Counsel said he informed the Petitioner when discovery was ready for his review. He said that he and the Petitioner had "several meetings" between the time that Counsel was retained and the trial date, at one of which they discussed discovery. Counsel said that the Petitioner's brother also came to his office and reviewed the discovery.

About the witness Tim McPeake, Counsel testified that Mr. McPeake was not a witness to the actual assault. Counsel said that the State's proof indicated that the fence in dispute was a boundary fence, which had been knocked down by a barn that had collapsed sometime before the assault. The victim was fixing the fence, and the assault had not occurred on the property rented by the Petitioner. Counsel noted that "curtilage" did not extend to open fields or to the neighbor's property. He said that he could not, therefore, figure out a way to make Mr. McPeake's testimony that the Petitioner rented the adjoining property relevant.

Counsel said that the knife was "clearly" a deadly weapon and that it was clear from the facts that the State alleged that this aggravated assault was based on the Petitioner's use of a deadly weapon.

Counsel stated that the trial court instructed on lesser-included offenses, which was Counsel's desire. He said that the way that the victim testified supported a conviction of simple assault rather than aggravated assault. Counsel further noted that the trial court must instruct on lesser-included offenses, so any objection to those would have been fruitless. Counsel said that he did not discuss with the Petitioner any lesser-included offense instructions, deeming it a strategic decision.

Counsel testified that the pocketknife was admissible. He said that Detective

Heatherington went to the Petitioner's house, and the Petitioner told her to come on in. The detective patted him down and found the knife in his pocket. Counsel said that it did not matter whether the victim's DNA was on the knife, the knife would still have been admissible.

About sentencing, Counsel testified that the Petitioner's health issues were reported at length in the presentence report. The report also indicated the Petitioner's age. Counsel said, in hindsight, he could have filed a one-page list of applicable mitigating factors that included the Petitioner's age and poor health. He opined, however, that it would not have made a difference at sentencing. Counsel said he did not call the Petitioner at sentencing because the Petitioner had already testified about his health and age during the trial. Further, he noted that there would be other unfavorable evidence that would have been admissible had the Petitioner testified. Counsel said that he did not think that the trial court would order a probation sentence in this case. He explained that he may not have discussed this with the Petitioner because, when the State offered a plea deal, the Petitioner said he was going to trial no matter what the State offered because this was a case of self defense. Counsel said that he, therefore, may not have discussed the Petitioner's potential sentence if he went to trial.

Counsel said that he felt his cross-examination of Mr. Phelps went "extremely well and exactly as [he had] planned." He acknowledged that it may not have been enough for the jury but said that he thought it went as well as it possibly could have. Counsel said he was unaware of a motion to impeach the witness and said he maybe should have filed one.

During cross-examination, Counsel testified that Mr. McPeake testified at the Petitioner's sentencing hearing about the Petitioner's health and described the Petitioner as a help to him. Counsel testified that, pretrial, he filed a motion to assert self-defense as an affirmative defense, which was successful. As such, the trial court instructed the jury on self-defense.

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends that Counsel was ineffective in five regards: (1) in allowing the lead detective to testify about a statement the Petitioner made on the night of his arrest despite a ruling that the statements were suppressed, (2) in failing to seek an instruction that the victim's testimony changed from the preliminary hearing until trial;

(3) in the manner that he dealt with discovery in this case; (4) in the manner that he presented or failed to present testimony during the sentencing hearing; and (5) in waiving the hearing on the motion for new trial.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the

8

range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the Petitioner first contends that Counsel was ineffective in allowing the lead detective to testify about a statement the Petitioner made on the night of his arrest despite a ruling that the statement was suppressed. The statement made by Detective Heatherington to which the Petitioner objects was when she testified that the Petitioner stated, "Come on in. I know why you're here" after she

9

knocked on the door. The post-conviction court concluded that the Petitioner had not met his burden of proof showing that Counsel's failure to object to this statement was ineffective assistance of counsel. We agree. The statements that were the subject of the suppression hearing included the statements made by the Petitioner in response to the detective's questioning. The Petitioner's statement allowing the officer entry was not a subject of the suppression order. The State asked the detective to testify only about what she observed and not what the Petitioner said. Counsel was not deficient for failing to object. Further, the Petitioner cannot prove prejudice. This statement showed that the Petitioner knew that the police were at his home because there was an altercation, but he admitted at trial that there was an altercation, claiming self defense. The Petitioner is not entitled to post-conviction relief on this ground.

The Petitioner next contends that Counsel was ineffective for failing to seek an instruction that the victim's testimony at trial differed from his preliminary hearing testimony. At trial, Counsel impeached the victim's testimony using the tapes from the preliminary hearing. It is unclear what instruction the Petitioner thinks Counsel was ineffective for failing to request. The jury was instructed that they must determine the credibility of the witnesses. It would be improper for the trial court to instruct the jury that one of the witnesses was not credible, as that determination is one to be made solely by the trier of fact. Counsel was not ineffective in this regard.

The Petitioner next argues that Counsel was ineffective in the manner that he dealt with discovery in this case. Counsel testified that the State provided them "open file" discovery. He reviewed the discovery with the Petitioner. He said that he did not begin representing the Petitioner until after the preliminary hearing and that the DNA testing and evidence collecting about which the Petitioner was complaining was neither practical nor would it have revealed helpful evidence. The Petitioner has not shown that Counsel was ineffective. He also has not shown that he was prejudiced. He did not offer any DNA testing or a video from the police officer's vehicle or the tripod itself, so there is no proof that any of this evidence would have aided the Petitioner's defense. He is not entitled to post-conviction relief based on speculation.

The Petitioner next contends that Counsel was ineffective for failing to present the Petitioner's testimony during the sentencing hearing. Counsel said he chose not to call the Petitioner because the evidence that related to mitigation, namely the Petitioner's age and medical history, were already in the record through his trial testimony and also the presentence report. Counsel was concerned about the damaging evidence that could have been introduced through cross-examination at the sentencing hearing. This is a reasonable strategic decision, and we will not second guess that decision in hindsight.

Finally, the Petitioner contends that Counsel was ineffective for waiving the

hearing on the motion for new trial. The Petitioner is unclear about how a hearing on his motion for new trial would have aided his defense. Our opinion filed in the Petitioner's first direct appeal reviewed all the issues presented by Counsel on appeal, and we did not refrain from discussing the law applicable to each issue, even those not detailed in the motion for new trial. We concluded that none of those issues had merit. We conclude that the Petitioner has not proven that Counsel was deficient in this regard or that the Petitioner was prejudiced by Counsel's representation.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE